No. 16,849.

CHAMBERLAIN ET AL. *v*. POE ET AL.

(256 P. [2d] 229)

Decided February 16, 1953.   Rehearing denied April 20, 1953.

Messrs. KOPERLIK & ALTMAN, Messrs. SEAVY & SEAVY, for plaintiffs in error.

Mr. CLARENCE W. BUTTON, Miss ALICE LOVELAND, for defendants in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

ROLLIN POE and Bettie L. Poe, to whom we hereinafter refer by name or as plaintiffs, began an action in the district court seeking damages in the sum of $12,000.00 against First Federal Savings and Loan Association and Allen Chamberlain, hereinafter designated by name or as defendants, for damages allegedly resulting from defendants' failure to secure flood insurance on plaintiffs' property. The cause was tried to a jury, which returned its verdict in plaintiffs' favor and against defendants in the sum of $9,333.00. After the overruling of the motion for a new trial, judgment was entered on the verdict, and defendants are here by writ of error seeking a reversal.

In the complaint it is alleged that Chamberlain is the agent of the corporate defendant, and during the transactions between plaintiffs and defendants, as hereinafter related, he was acting within the scope of his employment. In September, 1946, plaintiffs purchased certain real estate and improvements thereon located in Rye, Colorado, and in conjunction with the purchase executed their promissory note to the corporate defendant in the sum of $8,000.00 and secured the payment of the same by a deed of trust upon this property. Contemporaneously with the execution of the note and deed of trust, defendants agreed to secure an insurance policy in the sum of $12,000.00 protecting plaintiffs against flood and other damages, which policy defendants thereafter represented to plaintiffs had been procured, but which representation was, in fact, untrue. On June 19, 1947, a flood damaged plaintiffs' property in the sum of $14,-500.00, and on June 16, 1950, they began this action against defendants seeking damages in the sum of $12,-000.00 for the latter's failure to secure flood insurance as had been agreed. Chamberlain's answer was, in effect, a general denial. The corporate defendant, in its answer, admitted Chamberlain's relationship as alleged in the complaint; admitted plaintiffs' ownership of the property, and generally denied each and every other allega-

tion in the complaint. Defendant association has pleaded as affirmative defenses, settlement and satisfaction, estoppel and laches.

Plaintiffs' evidence may be thus summarized: They were desirous of purchasing a home at Rye, Colorado, and, in order to do so, were obliged to finance the same through a loan which they had had some difficulty in securing. Rollin was a World War II veteran and secured the Veterans Administration as an equal participant in plaintiffs' loan with the First Federal Association for the total sum of $8,000.00. Plaintiffs conducted their negotiations for the loan through a Mr. Nelson who was in charge of the business of the First Federal Association, and he advised them at the time the note and deed of trust were executed that insurance would be required for the protection of the loan and referred plaintiffs to defendant Chamberlain for the purpose of arranging for the insurance. After some discussion, insurance in the amount of $12,000.00 was agreed upon, and a policy in that amount was issued by an insurance broker in the employ of the loan association. Some discussion was had with Chamberlain about insurance coverage, and plaintiffs state that they insisted upon flood protection insurance and were assured by Chamberlain that a policy covering flood damage would be obtained for them. Subsequently a memorandum of the policy which Chamberlain had secured was mailed to plaintiffs with a letter of inquiry as to the coverage desired, to which letter no reply ever was received. The policy issued by defendants' insurance broker was what is known as a fire and extended coverage policy which, according to the memorandum policy furnished plaintiffs, but never read by them, disclosed that it did not include protection against flood damage. Although plaintiffs failed to read the deed of trust executed by them and were uninformed thereof, there was a provision therein requiring them to "keep all buildings now or hereafter on said premises, during the continu-

ance of the indebtedness secured hereby, insured against loss by fire, tornado, cyclone, wind, hail, war damage, storm and flood, and other hazards, casualties and contingencies, as the said Association shall require in some company approved by said Association * * *."

On June 19, 1947, a flood occurred which damaged plaintiffs' property in an amount found by an appraiser to be $7,000.00, and on June 20, 1947, Rollin telephoned Chamberlain and stated to him, "We have had a terrific flood out here and we are wiped out." and then asked, "We are still covered by flood insurance, aren't we?" Chamberlain replied, "Yes, you are." and promised to send out an adjuster the next morning. Subsequently plaintiffs were told by Chamberlain that their policy did not contain a flood insurance provision. Plaintiffs' note, secured by deed of trust, provided for the repayment of $8,000.00 in 216 monthly installments, beginning October 14, 1946, the monthly installments thereon being $52.02. After June 19, 1947—the date of the flood —defendants defaulted in the payment of monthly installments on their promissory note, and on November 4, 1947, the First Federal Association began foreclosure proceedings.

It is disclosed by the record that subsequent to June 19, 1947, and prior to November 30, 1947, many conferences were held between plaintiffs and defendants for the purpose of arriving at some amicable adjustment of plaintiffs' damage resulting from the flood, and in these conferences plaintiffs persistently contended that defendants were liable, and defendants consistently denied all liability.

November 30, 1947, while foreclosure proceedings were in progress and shortly before a sale might occur and a Certificate of Purchase issue, plaintiffs sent the following telegram to the corporate defendant:

"Please stop foreclosure proceedings on our property. Necessary details will be taken care of. Evidence of our intention was given in form of check to Mr. Simpson

[secretary of defendant corporation]. *Property will be rehabilitated at our expense.* Request that contract be extended to 25 years as approved by Veterans Administration. Respectfully submitted

                Bettie Lou and Rollin Poe."

(Italics ours.)

After November 30, 1947, the date upon which defendants received the telegram, and on December 6, 1947, the foreclosure proceedings were withdrawn as requested by plaintiffs, and subsequently plaintiffs and the corporate defendant executed a modification agreement dated January 17, 1948, and recorded February 24, 1948, wherein the monthly installments due on the note were reduced from $52.02 to $41.38, and the final payment thereon became due on September 14, 1971, instead of September 14, 1964, just as plaintiffs had requested in their telegram.

Almost immediately after the withdrawal of the foreclosure proceedings on December 6, 1947, plaintiffs began the rehabilitation of their property which, until that time, "was permitted to stand dormant, without being cleaned out, * * *." The evidence is that the house was livable at the time of the trial on July 9, 1951, which, of course, was after the expenditure by plaintiffs of $3,389.00 The total amount expended by plaintiffs for work, labor and materials in the rehabilitation of their home was, as we have said, $3,389.00, evidenced by checks introduced by them, the first of which bore date of December 18, 1947, the last being dated July 17, 1950. In December, 1947, and during the year 1948, plaintiffs expended the sum of $2,710.28, and the balance of their cash expenditures, amounting to $678.72, was expended during the years 1949 and 1950. Subsequent to December 6, 1947, plaintiffs reinstated their loan in full by the payment of all past due monthly installments, and thereafter continued the prompt payment of all monthly installments as they became due until June 16, 1951, just one year subsequent to the date this action was insti-

tuted. Rollin identified the telegram of November 30, 1947, to which reference has hereinbefore been made, and, with reference thereto, testified as follows: "Q. What caused you to send that telegram? A. At the last meeting, after the foreclosure proceedings were coming to an end, we had to find out what a desperate condition we would be in if we let it go through. We attempted to get the foreclosure proceedings stopped. The First Federal weren't apparently in the mood to do it, although we had tendered them a check for some $150.00 to show our good will about it, anyhow, we wanted to give them some cash. I, in turn called the Veterans Administration in Denver—this was our own theory—and they told me what to do to get it stopped, to put my *intentions* in writing and they would try to get it stopped. But I said: 'The First Federal Savings & Loan Association doesn't want to go along on stopping it unless we agree to pick up all the back payments.' They said: 'We'll take care of that,' and in turn they called the First Federal—well I don't know actually that they told them what they told me. Anyhow it was through us and the Veterans Administration that we got this foreclosure stopped. About this wire, they told me to advance this money to show my evident good intentions in carrying it out and that they had to have it in writing, that it should be in writing to the First Federal Savings & Loan Association. We couldn't get any mail through to town so I wired them Western Union. Q. As a result of that conversation with the Veterans Administration when you called their office, you sent that wire, is that right? A. Yes, sir. Q. Did you at the time of this telephone conversation [sic] relinquish any claim you had against the First Federal? A. I did not."

So far as the record reveals, subsequent to November 30, 1947, the date upon which the telegram was sent resulting in the withdrawal of the foreclosure proceedings and the modification agreement, plaintiffs never claimed or asserted any right whatsoever pertaining to damages

as alleged in their complaint, and not until the filing of this suit on June 16, 1950—more than two years and six months after their telegram—was any such claim ever made. It also is noteworthy that plaintiffs were not asked, nor did they state, what their intentions were, so far as defendants were concerned, other than expressed by them in their telegram. There is no record of any conferences after November 30, 1947, wherein defendants' liability was mentioned or discussed and none in the record limiting or otherwise qualifying or explaining plaintiffs' direct statement that they would rehabilitate the property at their expense. There is no intimation by word or act even tending to convey to defendants that plaintiffs had any intention whatever of asserting any claim against them if the proposal contained in their telegram was accepted, as the undisputed evidence shows was done. From the record it appears that plaintiffs considered the rehabilitation of their home of paramount importance, and the acceptance of their proposal accomplished this result.

At the conclusion of plaintiffs' evidence, defendants interposed their motion for a directed verdict "on the grounds that plaintiffs by their testimony and evidence have failed to make out a cause of action against the defendants or either of them." The motion was denied.

After the denial of the defendants' motion for a directed verdict, they introduced evidence denying any agreement to obtain an insurance policy with a flood provision therein for plaintiffs' benefit and also evidence to establish that Rye, Colorado, being in a flood conservancy district, such a policy was not obtainable.

Defendants' specifications of error include, with many others, objections to the court's instruction on the measure of damages, and its failure to direct a verdict, and these are the only specifications we deem it necessary to consider on this review. We shall treat them in the order mentioned.

1. Plaintiffs' evidence is positive and definite

that the First Federal Association would not withdraw foreclosure proceedings upon their request, and it was at the suggestion of the Veterans Administration that the November 30 telegram, supra, was sent. Until that time the existence and extent of defendants' liability was seriously controverted. It is singularly strange that throughout the trial no evidence whatever was introduced to establish the basis of recovery to which plaintiffs would have been entitled had an insurance policy been obtained with flood protection. In fact the record is devoid of all evidence upon which an instruction on the measure of damages could properly be based. An objection to such instruction having been interposed and a record thereof having been preserved, error was committed in giving the same.

We do not reverse the judgment on this specification alone because this error could be corrected on another trial.

2. The vulnerable and insurmountable objection to the judgment in this action arises out of the November 30 telegram. Plaintiffs' claim was unliquidated and in dispute on November 30. The right of foreclosure then was defendants' property right, and this is not questioned or controverted. The mortgage on plaintiffs' property was in imminent danger of foreclosure, to prevent which plaintiffs dispatched the telegram which was couched in clear, plain and unambiguous language, readily understood by a man of ordinary intelligence. No attempt whatever is made to either modify, vary or depart therefrom by any act or statement of intention contrary to that conveyed by the language itself. If, at the time of sending the telegram, plaintiffs had an intention to do otherwise than as stated therein, it was a secret withheld from defendants for plaintiffs' own advantage. Plaintiffs had endeavored, without success, to have the foreclosure proceedings withdrawn, and, at the suggestion of the Veterans Administration, they reduced their proposal to writing, stating that it was their pur-

pose thereby to show their good intention. Evidently, from plaintiffs' standpoint, the telegram accomplished the desired result, and the rehabilitation of plaintiffs' property was to be consummated.

The proposal contained in the November 30 telegram, separated into its component parts, when accepted, obligated defendant association to forego and relinquish its conceded property right of foreclosure; it obligated it to extend the time of payment of plaintiffs' promissory note from September 14, 1964, to September 14, 1971; it obligated it to accept monthly installments of $41.38 rather than $52.02. In exchange and as a consideration for the relinquishment of these rights which defendant might, under the deed of trust, require plaintiffs to fully comply with, plaintiffs promised and agreed to rehabilitate their property at their expense. Plaintiffs' evidence discloses that defendant association complied with every obligation and condition on its part to be performed, and accepted plaintiffs' proposal in toto as disclosed by their telegram. Thereafter plaintiffs immediately began the execution of their part of the proposal by the rehabilitation of their property as evidenced by their cancelled checks introduced as exhibits herein. For more than two and a half years plaintiffs, neither by statement, act or conduct, apprised defendants of any intention other than that as proposed in their telegram. The first demand made by plaintiffs against defendants for damages as sought, was by the institution of this action by which they seek to avoid the proposal contained in their telegram of November 30, and, rather than rehabilitating their property at their expense, they take the position that neither by the terms of the telegram and its acceptance by defendant nor by their execution of the modification agreement did they intend to relinquish their claim for damages against defendants. If plaintiffs had such secret intention, they were clever in the concealment thereof for a period of more than two and a

half years, during all of which time their acts and conduct was such as to justify a reasonably intelligent man to assume that the controversy between plaintiffs and defendants, arising out of the expense of rehabilitating their property was definitely and finally concluded. Plaintiffs' own evidence plainly, clearly and definitely establishes the fact that defendant association had repeatedly refused to withdraw its foreclosure proceedings, and it was only after plaintiffs promised and agreed to rehabilitate their property at their expense that a settlement of all controversial matters between the parties to this litigation was accomplished.

According to plaintiffs' evidence, no conferences occurred with defendants relative to any claim for damages arising out of the June 19, 1947, flood after they dispatched their telegram of November 30; no contention arose between the parties respecting defendants' liability to plaintiffs on account of the June 19, 1947, flood; no intimation was given defendants of any intention of plaintiffs that any unsettled matter respecting damages remained undetermined, and for more than two and a half years plaintiffs, by their actions and conduct, led defendants to rely upon their promise of rehabilitating their property at their expense.

It is a settled principle of law that when one by his conduct, actions or express words leads another to believe in the existence of a certain condition of things of more or less advantage to the one so believing, which results in the believer's action and reliance thereon so as to change his existing position, the one whose acts, conduct or words caused the belief and reliance is forever precluded from asserting against such believer a different state or condition of things as existing at the same identical time. Under this principle and the evidence in this case, plaintiffs are estopped and forever barred from maintaining an action such as the present one, and the trial court erred in denying defendants' motion for a directed verdict.

Accordingly, the judgment is reversed and the cause remanded with instructions to dismiss the same.

Mr. Justice Holland dissents.